RECEIVED
USDC, WESTERN DISTRICT OF LA
TONY R. MOORE, CLERK
DATE 9/27/12

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

MONROE DIVISION

| | |
|---|---|
| JEREMIAH TAYLOR, ET AL. | CIVIL ACTION NO. 66-12171 |
| VERSUS | JUDGE ROBERT G. JAMES |
| OUACHITA PARISH SCHOOL BOARD, ET AL. | MAG. JUDGE KAREN L. HAYES |

### RULING

This is a desegregation action originally brought in 1966 by parents of black students attending school in Ouachita Parish, Louisiana. On January 30, 1970, the Court issued a desegregation decree, under which the Ouachita Parish School Board ("the School Board") has operated, with modification and amendment, for more than forty years.

Pending before the Court is an Amended Motion for Declaration of Partial Unitary Status as to Faculty Assignments, Staff Assignments, Extra-Curricular Activities and Physical Facilities ("Motion for Partial Unitary Status") [Doc. No. 133] filed by the School Board. The School Board contends that it has complied with its duty to desegregate, eliminated the vestiges of past discrimination, and should be declared unitary in the identified areas. No opposition has been filed.

For the following reasons, the motion is GRANTED. The Court finds that the School Board has achieved unitary status in the areas of faculty and staff assignments, extra-curricular activities, and physical facilities and hereby relinquishes supervision of these areas. To the extent applicable, the respective portions of the decree are DISSOLVED AND DISMISSED.

### I.   FACTS

This lawsuit, filed July 22, 1966, as a class action on behalf of black students in Ouachita

Parish, sought preliminary and permanent injunctive relief against the School Board's operation and administration of its public schools on a racially discriminatory basis.

On August 3, 1966, the case came for trial.[1] At the conclusion of trial, the Court, Judge Ben Dawkins presiding, issued a desegregation decree. In that decree, Judge Dawkins permanently enjoined the School Board as follows:

a. Subject to the plan of desegregation to be ordered herein, continuing to refuse to admit minor plaintiffs, or the members of the class they represent, to the schools which they would attend if they were white;

b. Continuing to assign students to schools with regard to race or color;

c. Continuing to operate a compulsory bi-racial school system in Ouachita Parish, Louisiana;

d. Continuing to maintain dual school zone or attendance area lines based on race or color;

e. Continuing to approve budgets, construction programs, policies, curricula and programs designed to perpetuate, maintain or support a school system operated on a racially segregated basis.

The Court further ordered the School Board to submit a plan of desegregation for approval, effective for the 1966-67 school term. The Court deferred the issue of desegregation of teaching and administrative personnel until the plan for desegregation of the students had been "accomplished or . . . made substantial progress." *August 3, 1966 Decree.* Finally, the Court retained jurisdiction over the case "for such further orders as may be necessary, just, and proper." *Id.*

---

[1] Although the original caption of this suit was *Donald Newton, et al., v. Ouachita Parish School Board, et al.*, on August 3, 1966, the named plaintiff, Jeremiah Taylor, intervened, and the suit came to bear his name.

On August 5, 1966, the Court adopted a so-called freedom of choice desegregation plan, which did not change student assignments, but allowed parents to apply for transfer or reassignment to a school of their choice.

However, in *Adams v. Matthews*, 403 F.2d 181 (5th Cir. 1968), the United States Court of Appeals for the Fifth Circuit applied the Supreme Court's decision in *Green v. Cnty. Sch. Bd. of New Kent Cnty., Va.*, 391 U.S. 430 (1968), and held that district courts "should make findings of fact and state conclusions of law as to (1) whether the school board's existing plan of desegregation is adequate 'to convert (the dual system) to a unitary system in which racial discrimination would be eliminated root and branch' and (2) whether the proposed changes will result in a desegregation plan that 'promises realistically to work now.' An effective plan should produce integration of faculties, staff, facilities, transportation, and school activities (such as athletics) along with integration of students." 403 F.2d at 188 (quoting *Green*, 391 U.S. at 438). Although the Fifth Circuit did not categorically strike down freedom of choice plans, the *Adams* court was clear that, "[i]f in a school district there are still all-Negro schools or only a small fraction of Negroes enrolled in white schools, or no substantial integration of faculties and school activities then, as a matter of law, the existing plan fails to meet constitutional standards as established in *Green*." *Id.* As an alternative to freedom of choice, the Fifth Circuit suggested that desegregation plans assign students on the basis of geographic attendance zones and that "school authorities should consider the consolidation of certain schools, pairing of schools and a majority-to-minority transfer policy as means to the end of disestablishing the dual system." *Id.*

On November 14, 1968, the judges of the Western District of Louisiana held a consolidated hearing on all pending desegregation cases and concluded that the freedom of choice desegregation

plan was the best plan available. On appeal, the Fifth Circuit disagreed and, on May 28, 1969, reversed the district courts, remanding for further proceedings.

On June 5, 1969, the judges of the Western District of Louisiana ordered the affected school boards to work with the then-named United States Department of Health, Education, and Welfare, Office of Education, to develop new desegregation plans.

On August 30, 1969, this Court approved the plan submitted by the School Board which called for the integration of all white elementary schools (grades 1-6) by assigning students to the schools in the area where they live. The black schools were allowed to remain all-black and except for those elementary students living in the vicinity of white elementary schools, students continued to be assigned by freedom-of-choice, although the plan incorporated a proposal for the integration of all schools in 1970-71.

An appeal from the August 30, 1969 order was pending when the Supreme Court decided *Alexander v. Holmes Cnty. Bd of Educ.*, 396 U.S. 19 (1969), which held that the Fifth Circuit "should have denied all motions for additional time because continued operation of segregated schools under a standard of allowing 'all deliberate speed' for desegregation is no longer constitutionally permissible. Under explicit holdings of this Court the obligation of every school district is to terminate dual school systems at once and to operate now and hereafter only unitary schools." *Id.* at 20 (citations omitted). Shortly thereafter, the Fifth Circuit held in *Singleton v. Jackson Municipal Separate School District*, 419 F.2d 1211 (5th Cir. 1969), that faculty desegregation should be effected no later than February 1, 1970.[2] Based on *Alexander* and *Singleton*,

---

[2]*Singleton* permitted the school boards to defer implementation of desegregation plans until September 1970, but that portion was later reversed by the Supreme Court.

on December 9, 1969, the Court's Order in this and three consolidated cases was summarily reversed and *Singleton* relief was ordered. Under *Singleton*, the School Board was required, in part (1) to announce and implement policies for the non-discriminatory hiring, assignment, promotion, pay, demotion, and dismissal of principals, teachers, teacher aides and other staff, (2) to have a majority to minority student transfer policy, (3) to re-examine its transportation system so that bus routes and the assignment of students to buses will be designed to ensure the transportation of all eligible pupils on a non-segregated and otherwise non-discriminatory basis, (4) to ensure that all school construction, school consolidation, and site selection (including the location of any temporary classrooms) be done in a manner which will prevent the recurrence of the dual system, and (5) to permit the transfer of students living in the district to a school outside the district on a non-discriminatory basis. *See December 10, 1969 Court Order* (requiring School Board to comply with the Fifth Circuit's December 9, 1969 Order). On January 30, 1970, the Court issued a new Decree, implementing the desegregation plan approved by the Office of Education. On appeal, on April 13, 1970, the Fifth Circuit made slight modifications to the plan, including a provision for minority to majority transfers.

In 1971, the Court required that a twelve-member bi-racial committee be implemented to examine the schools in the District. At the recommendation of the committee, the Court slightly modified the desegregation plan.

More recently, on August 5, 1998, then-Plaintiffs and the School Board entered into a Settlement and Compromise Agreement ("Compromise Agreement"). The School Board agreed to use all "reasonable means" and "best efforts" to work toward a "target goal" of a racial makeup of 75% white and 25% black for faculty, staff, and administrators, consistent with the racial makeup

of the student population of the District. While the parties recognized that it might not be possible to achieve the target goal, they also agreed to specific steps to help in the effort. They created a Minority Recruitment Oversight Committee, a citizens' advisory committee comprised of five minority residents of the District. The School Board also created two positions of minority recruitment coordinators, which are employment positions filed by minority employees. Finally, the parties agreed that the distribution and assignment of faculty, staff, and administrators would "substantially reflect" the overall racial makeup of the employees of the District.

For many years, this case proceeded with little activity other than an occasional motion for slight modification of the Decree or for approval of a construction project. However, in late 2009 and early 2010, the Court began meeting with representatives of the remaining open desegregation cases in the Monroe Division to determine if any of the districts had achieved unitary status or, if not, what steps the districts needed to take to achieve unitary status.

On January 5, 2010, the Court held a status conference in this case attended by counsel for and representatives of the School Board and Louis Scott, who had been counsel for some of the Plaintiffs. At that time, the Court *sua sponte* ordered the School Board to meet and consider action towards achieving unitary status. The Court also instructed counsel for Plaintiffs to determine the status of any remaining Plaintiffs and whether there may be appropriate substitute Plaintiffs.

On March 10, 2010, the Court again met with counsel and representatives. Mr. Scott reported that he had spoken with one of the named Plaintiffs, Bertrand Britton, and one other potential Plaintiff, but neither Mr. Britton nor the other potential Plaintiff retained Mr. Scott to take action in the case.

On November 8, 2010, the Court held another status conference. Elmer Noah, counsel for

the School Board, reported that Mr. Scott had taken out an advertisement soliciting potential Plaintiffs, but had not been retained. Mr. Scott did not attend the status conference. A demographer retained by the School Board, Michael Hefner, was present at the conference and reported that he would be obtaining all information necessary to conduct an appropriate review of the school system under the *Green* factors.

On February 11, 2011, the Court held a status conference. Counsel and representatives for the School Board were present, along with Mr. Hefner. Mr. Hefner stated that he had prepared a draft report on the School Board's compliance with *Singleton* and the Compromise Agreement, using a 20% deviation from student racial demographics to determine if any schools were racially identifiable. He noted his intent to provide a final version of the report at a School Board meeting prior to the next status conference.

On March 11, 2011, the Court held the next status conference, which was again attended by counsel and representatives for the School Board and Mr. Hefner. Mr. Hefner reported that he had completed his unitary status review on faculty and staff assignments. Counsel for the School Board indicated his intent to file a motion for partial unitary status in these areas on the basis of Mr. Hefner's findings.

On October 24, 2011, the Court held another status conference. That conference was attended by counsel and representatives of the School Board, Mr. Hefner, and Willie Hunter, another counsel for some of the Plaintiffs. The School Board reported that it had implemented Mr. Hefner's recommendations on staff and faculty assignment. The School Board had also held two community meetings at the Richwood High School cafeteria. Mr. Hunter was present at that second meeting and reported that he was satisfied with the School Board's efforts and communication thus far. Mr.

Hefner stated that he would proceed with his review of the other *Green* factors.

On March 5, 2012, the Court held another status conference. Since the last conference, Mr. Hefner had completed his report on extracurricular activities, and the School Board had provided a copy to Mr. Hunter and Mr. Scott prior to the status conference. Neither attorney had contacted the School Board or its counsel, and neither attorney was present at the conference.

On June 4, 2012, the Court held another status conference. Since the last conference, Mr. Hefner had completed his report on facilities and stated that he was nearing completion of his report on transportation. Mr. Hunter was present at the conference and articulated concerns about the potential effects of the state educational reform on desegregation. However, he did not express concerns about any of Mr. Hefner's reports.

On July 17, 2012, the School Board filed a Motion for Declaration of Partial Unitary Status as to Faculty Assignments, Staff Assignments, Extra-Curricular Activities, and Physical Facilities [Doc. No. 130]. A status conference was subsequently held on July 20, 2012. At that time, Mr. Hunter stated that he intended to file a pleading with the Court indicating that he is no longer representing any Plaintiffs and that he takes no position on the School Board's motion for a unitary status declaration, but that he has attended meetings in the community and has heard nothing to suggest that the motion is opposed. At the Court's request, however, the School Board agreed to filed an amended motion to detail all efforts it has made to notify and involve the community in the unitary status review.

On September 5, 2012, the School Board filed the pending Motion for Declaration of Unitary Status. Although notice was provided to Plaintiffs' former counsel and at the most recent personal addresses available, none of the private Plaintiffs have filed an objection to a finding of unitary

8

status. No governmental entity has sought to intervene in this lawsuit, so the motion stands uncontested.

## II.   LAW AND ANALYSIS

When first presented with a school desegregation case, a district court is charged with determining whether or not a school board has maintained or facilitated a dual school system in violation of the Equal Protection Clause of the United States Constitution. U.S. CONST., Amend. XIV. If the district court finds such a violation, then under *Brown v. Bd. of Educ. of Topeka, Shawnee County, Kan.*, 347 U.S. 483 (1954), and *Brown v. Bd. of Educ.*, 349 U.S. 294 (1955), the dual system must be dismantled, and the school board must "take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch." *Green*, 391 U.S. at 437-38.

Neither a school board's nor a district court's duty ends with the initial desegregation order. Rather, there is a "continuing duty [for school officials] to eliminate the system-wide effects of earlier discrimination and to create a unitary school system untainted by the past." *Ross v. Houston Indep. Sch. Dist.*, 699 F.2d 218, 225 (5th Cir. 1983) (citing *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 15 (1971)). Likewise, the district court "retain[s] jurisdiction until it is clear that state-imposed segregation has been completely removed." *Id.* (citing *Green*, 391 U.S. at 439; *Raney v. Bd. of Educ.*, 391 U.S. 443, 449 (1968)).

Ultimately, however, the goal of the district court is to return "schools to the control of local authorities at the earliest practicable date." *Freeman v. Pitts*, 503 U.S. 467, 490 (1992). In discharging this duty, the district court considers the Supreme Court's "*Green* factors": (1) faculty and staff assignments; (2) transportation; (3) extra-curricular activities; (4) facilities; and (5) student

assignments. *Green*, 391 U.S. at 435; *see also Bd. of Educ. of Okla. City Pub. Sch. v. Dowell*, 498 U.S. 237, 250 (1991). The district court may find that a school board has reached partial unitary status on one or more factors. *Freeman*, 503 U.S. at 489. A school board "bears the burden of showing that any current imbalance [in these areas] is not traceable, in a proximate way, to the prior violation." *Id.* at 493.

"The District Court should address itself to whether the Board had complied in good faith with the desegregation decree since it was entered, and whether the vestiges of past discrimination had been eliminated to the extent practicable." *Dowell*, 498 U.S. at 249-50; *Freeman*, 503 U.S. at 491; *Green*, 391 U.S. at 439; *Ross*, 699 F.2d at 225. To meet its obligation, "[f]or at least three years, the school board must report to the district court." *Monteilh v. St. Landry Parish Sch. Bd.*, 848 F.2d 625, 629 (5th Cir. 1988). Further, "the district in question must have for several years operated as a unitary system." *Lemon v. Bossier Parish Sch. Bd.*, 444 F.2d 1400, 1401 (5th Cir. 1971). If the Court determines that there is no evidence of continued racial discrimination and the school board has acted in good faith to maintain non-discriminatory practices, it may declare the district unitary in one or more subject areas. *See Freeman*, 503 U.S. at 490-91; *see also Price v. Austin Indep. Sch. Dist.*, 945 F.2d 1307, 1314 (5th Cir. 1991) (We use the term "unitary" to refer to a school district that "has done all that it could to remedy the [prior] segregation caused by official action.").

### A. The *Green* Factors

#### 1. Faculty and Staff Assignments

First, the Court must consider whether the School Board has established that the district

is unitary in faculty and staff assignments under *Green*.³ The Fifth Circuit has instructed:

> In *Singleton v. Jackson Municipal Separate School District*, we announced several requirements for hiring and assigning faculty and staff in schools under desegregation orders. *See* 419 F.2d 1211, 1217-18 (5th Cir.1969) (*en banc*), *rev'd in part sub. nom., Carter v. West Feliciana Parish Sch. Bd.*, 396 U.S. 290, 90 S.Ct. 608, 24 L.Ed.2d 477 (1970). Only two of the *Singleton* requirements are relevant here. First, a school must show that faculty and staff who work directly with children are assigned in such a manner that the racial composition of the faculty and staff would not indicate that the school is intended for either African-American or white students. *Id.* Second, "discrimination on the basis of race, color or national origin in the hiring, assignment, promotion, pay, demotion or dismissal of faculty members and administrative staff" is prohibited. *Fort Bend Ind. Sch. Dist. v. Stafford*, 651 F.2d 1133, 1138 (5th Cir. 1981) (discussing *Singleton*, 419 F.2d at 1217-18). We have made clear that these requirements do not establish an arbitrary racial quota. *See id.* at 1139.

*Anderson v. School Bd. of Madison Cnty., Ms.*, 517 F.3d 292, 303 (5th Cir. 2008). The August 5, 1998 Compromise Agreement approved by the Court attempted to achieve the goals of desegregation and comply with *Singleton* by setting a "target goal" of 75% white and 25% black ratio for staff and faculty combined, which mirrored the student racial demographics in the District at that time. Likewise, the Compromise Agreement set the same target goal for administrative hiring of principals, assistant principals and Central Office personnel. Consistent with desegregation case law, the School Board agreed to use reasonable means and best efforts to work toward the target goal.

Since 1998, the School Board has overseen the administration of the provisions of the Compromise Agreement. It has adopted and implemented policies and procedures consistent with both the directives of *Singleton* and the Compromise Agreement. The School Board has employed two Minority Recruitment Coordinators and has worked with the Minority Recruitment Oversight

---

³Although *Green* treats faculty assignments and staff assignments as two separate areas, the Court considers them under one heading since the facts and history contain similar, if not identical, information.

Committee to increase minority employment through efforts such as attendance at college and university job fairs. The number of minorities in faculty, staff, and administrative positions does not reach the target goal, but the School Board has offered non-discriminatory reasons for its failure to achieve that goal. The School Board's Personnel Director, Don Coker, and a member of the Minority Recruitment Oversight Committee, Richard Young, averred that the School Board's efforts have been significantly hampered by the lack of minority graduates in the field of education and the aggressive competition for those graduates by surrounding states, which often pay considerably higher salaries.

Additionally, the School Board has demonstrated non-discriminatory hiring and assignment practices in the area of faculty and staff assignments. Although the Court has received no formal complaints about faculty and staff assignments in the almost fifteen years since the Compromise Agreement was reached, the School Board has continued to strive to meet its desegregation duties. Beginning with the 2011-12 school year, the School Board considered and implemented Mr. Hefner's recommendations on ways to improve diversity of faculty and staff at schools throughout the district. As a result, the School Board has made great progress toward the target goal.

Although the School Board cannot offer the Court "perfect" statistics or quotas, it is not required to do so. The Court finds that the School Board has effectively eradicated any vestige of past discrimination with regard to faculty and staff assignments and has consistently implemented and maintained non-discriminatory policies and practices for several years, demonstrating it has attained unitary status in that area of operation. The Court has confidence that this School Board will continue to hire, assign, and promote faculty and staff in a non-discriminatory fashion and in a manner that furthers the goals of desegregation. Therefore, the School Board is declared unitary in

the area of faculty and staff assignments. The Court relinquishes jurisdiction over these areas, and the related portions of the Decree and/or orders of the Court are DISSOLVED AND DISMISSED.

### 2. Extra-Curricular Activities

A school district's extra-curricular activities will be deemed unitary if the district provides equal access for all students. *Quarles v. Oxford Mun. Sep. Sch. Dist.*, 868 F.2d 750, 757 (5th Cir. 1989) (citing *Bazemore v. Friday*, 478 U.S. 385 (1986)).

Neither the School Board nor this Court is aware of any specific provisions in the decree or other orders relating to extracurricular activities. Nevertheless, as part of his unitary status review, Mr. Hefner provided the Court with an expert report demonstrating that the School Board has endeavored to and succeeded in eliminating all vestiges of past discrimination from its extra-curricular programs throughout the District. In accordance with policy, students participate in the various offered activities on a completely voluntary basis. The School Board has not created any barriers which would deter or prevent a student from participating in an activity of his or her choice. A simple review of the yearbooks from the schools throughout the District demonstrates that students of all races participate in the extracurricular activities offered.

The Court finds that the School Board is unitary in the area of extra-curricular activities. The Court relinquishes jurisdiction over this area.

### 3. Facilities

Physical facilities should be deemed unitary when the school board has ensured, to the extent practicable, that its facilities are not amenable to racial identification simply on the basis of their physical condition. *Swann,*, 402 U.S. at 18.

The physical facilities used by the School Board to house the various elementary, middle, and

high schools throughout the District have been previously approved by the Court based on the student population in each area. The physical campuses differ in construction, age, and design, but Mr. Hefner reports, and the Court has no information otherwise, that the facilities provide adequate space for their educational use and are all well maintained.[4] Additionally, the School Board, through the passage of bond issues in the East and West Ouachita Taxing Districts, has been able to ensure that classrooms are equally equipped with "smartboards"[5] and other forms of technology. The Court agrees with Mr. Hefner that the School Board has shown a pattern of actively reviewing and addressing the facility needs of all schools in a race-neutral manner.

The Court finds that the School Board is unitary in the area of physical facilities. The Court relinquishes jurisdiction over this area and, to the extent applicable, any related provisions of the Decree and/or orders of the Court are DISSOLVED AND DISMISSED.

### B. Good Faith

The Court's findings with regard to the *Green* factors of faculty and staff assignments, extra-curricular activities, and physical facilities constitute outward signs of the School Board's

---

[4]Although there was some disparity in the amounts spent on the schools, the disparity is based upon the natural growth in student populations, not based on any discriminatory reason. Further, as noted by Mr. Hefner, there is no indication that one racial group is favored over another in bond projects.

[5]Smartboards are the technological replacement of chalkboards and whiteboards. Invented in 1991, the smartboard is a

> digital whiteboard that is touch sensitive and runs off of local computer system resources. It is an interactive whiteboard that can save and store any information that is written on it, as well as enable the user to refer to notes downloaded from the Internet or other sources.

http://www.wisegeek.com/what-is-a-smartboard.htm, last visited 09/18/12.

commitment to its students, employees, the public, and this Court that it has, in good faith, erased all vestiges of prior discrimination in these areas. Having fully reviewed the submissions of the School Board, the Court also finds that it has demonstrated its good faith commitment to the goals of desegregation, so that students, parents, and the public have assurance that the School Board will not engage in further discrimination.

### III. CONCLUSION

For the foregoing reasons, the School Board's motion is GRANTED. The Court finds that the School Board has demonstrated that it has achieved unitary status in the areas of faculty and staff assignments, extra-curricular activities, and physical facilities; has exhibited good faith in achievement and maintenance of such non-discriminatory programs; and is prepared, willing, and ready to move forward in a constitutionally consistent manner without direct judicial supervision in these areas. The Court will relinquish is supervision of these areas and return supervision to the School Board. Any respective portions of the Decree and/or orders of this Court related to these areas are DISSOLVED AND DISMISSED. The School Board remains under the supervision of the Court in the areas of transportation and student assignment.

MONROE, LOUISIANA, this 27 day of September, 2012.

ROBERT G. JAMES
**UNITED STATES DISTRICT JUDGE**