UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

MONROE DIVISION

| | |
|---|---|
| **JEREMIAH TAYLOR, ET AL.** | **CIVIL ACTION NO. 66-12171** |
| **VERSUS** | **JUDGE ROBERT G. JAMES** |
| **OUACHITA PARISH SCHOOL BOARD, ET AL.** | **MAG. JUDGE KAREN L. HAYES** |

## RULING

This is a desegregation action originally brought in 1966 by parents of black students attending school in Ouachita Parish, Louisiana. On January 30, 1970, the Court issued a desegregation decree, under which the Ouachita Parish School Board ("the School Board") has operated, with modification and amendment, for more than forty years.

Pending before the Court is a Motion for Declaration of Unitary Status and for Dismissal [Doc. No. 144] filed by the School Board, seeking unitary status in the remaining areas of student assignment and transportation. For the following reasons, the motion is GRANTED. The Court relinquishes supervision of these areas, the Decree is DISSOLVED, and the case is DISMISSED WITH PREJUDICE.

**I.   FACTS**

This lawsuit, filed July 22, 1966, as a class action on behalf of black students in Ouachita Parish, sought preliminary and permanent injunctive relief against the School Board's operation and administration of its public schools on a racially discriminatory basis.

On August 3, 1966, the case came for trial.[1] At the conclusion of trial, the Court, Judge Ben Dawkins presiding, issued a desegregation decree. In that decree, Judge Dawkins permanently enjoined the School Board from:

a. Subject to the plan of desegregation to be ordered herein, continuing to refuse to admit minor plaintiffs, or the members of the class they represent, to the schools which they would attend if they were white;

b. Continuing to assign students to schools with regard to race or color;

c. Continuing to operate a compulsory bi-racial school system in Ouachita Parish, Louisiana;

d. Continuing to maintain dual school zone or attendance area lines based on race or color;

e. Continuing to approve budgets, construction programs, policies, curricula and programs designed to perpetuate, maintain or support a school system operated on a racially segregated basis.

The Court further ordered the School Board to submit a plan of desegregation for approval, effective for the 1966-67 school term. The Court deferred the issue of desegregation of teaching and administrative personnel until the plan for desegregation of the students had been "accomplished or . . . made substantial progress." *August 3, 1966 Decree.* Finally, the Court retained jurisdiction over the case "for such further orders as may be necessary, just, and proper." *Id.*

On August 5, 1966, the Court adopted a so-called freedom of choice desegregation plan, which did not change student assignments, but allowed parents to apply for transfer or reassignment

---

[1] Although the original caption of this suit was *Donald Newton, et al., v. Ouachita Parish School Board, et al.*, on August 3, 1966, the named plaintiff, Jeremiah Taylor, intervened, and the suit came to bear his name.

2

to a school of their choice.

However, in *Adams v. Matthews*, 403 F.2d 181 (5th Cir. 1968), the United States Court of Appeals for the Fifth Circuit applied the Supreme Court's decision in *Green v. Cnty. Sch. Bd. of New Kent Cnty., Va.*, 391 U.S. 430 (1968), and held that district courts "should make findings of fact and state conclusions of law as to (1) whether the school board's existing plan of desegregation is adequate 'to convert (the dual system) to a unitary system in which racial discrimination would be eliminated root and branch' and (2) whether the proposed changes will result in a desegregation plan that 'promises realistically to work now.' An effective plan should produce integration of faculties, staff, facilities, transportation, and school activities (such as athletics) along with integration of students." 403 F.2d at 188 (quoting *Green*, 391 U.S. at 438). Although the Fifth Circuit did not categorically strike down freedom of choice plans, the *Adams* court was clear that, "[i]f in a school district there are still all-Negro schools or only a small fraction of Negroes enrolled in white schools, or no substantial integration of faculties and school activities then, as a matter of law, the existing plan fails to meet constitutional standards as established in *Green*." *Id.* As an alternative to freedom of choice, the Fifth Circuit suggested that desegregation plans assign students on the basis of geographic attendance zones and that "school authorities should consider the consolidation of certain schools, pairing of schools and a majority-to-minority transfer policy as means to the end of disestablishing the dual system." *Id.*

On November 14, 1968, the judges of the Western District of Louisiana held a consolidated hearing on all pending desegregation cases and concluded that the freedom of choice desegregation plan was the best plan available. On appeal, the Fifth Circuit disagreed and, on May 28, 1969, reversed the district courts, remanding for further proceedings.

3

On June 5, 1969, the judges of the Western District of Louisiana ordered the affected school boards to work with the then-named United States Department of Health, Education, and Welfare, Office of Education, to develop new desegregation plans.

On August 30, 1969, this Court approved the plan submitted by the School Board which called for the integration of all white elementary schools (grades 1-6) by assigning students to the schools in the area where they live. The black schools were allowed to remain all-black and except for those elementary students living in the vicinity of white elementary schools, students continued to be assigned by freedom-of-choice, although the plan incorporated a proposal for the integration of all schools in 1970-71.

An appeal from the August 30, 1969 order was pending when the Supreme Court decided *Alexander v. Holmes Cnty. Bd of Educ.*, 396 U.S. 19 (1969), which held that the Fifth Circuit "should have denied all motions for additional time because continued operation of segregated schools under a standard of allowing 'all deliberate speed' for desegregation is no longer constitutionally permissible. Under explicit holdings of this Court the obligation of every school district is to terminate dual school systems at once and to operate now and hereafter only unitary schools." *Id.* at 20 (citations omitted). Shortly thereafter, the Fifth Circuit held in *Singleton v. Jackson Mun. Separate Sch. Dist.*, 419 F.2d 1211 (5th Cir. 1969), that faculty desegregation should be effected no later than February 1, 1970.[2] Based on *Alexander* and *Singleton*, on December 9, 1969, the Court's Order in this and three consolidated cases was summarily reversed and *Singleton* relief was ordered. Under *Singleton*, the School Board was required, in part (1) to announce and

---

[2] *Singleton* permitted the school boards to defer implementation of desegregation plans until September 1970, but that portion was later reversed by the Supreme Court.

implement policies for the non-discriminatory hiring, assignment, promotion, pay, demotion, and dismissal of principals, teachers, teacher aides and other staff, (2) to have a majority to minority student transfer policy, (3) to re-examine its transportation system so that bus routes and the assignment of students to buses will be designed to ensure the transportation of all eligible pupils on a non-segregated and otherwise non-discriminatory basis, (4) to ensure that all school construction, school consolidation, and site selection (including the location of any temporary classrooms) be done in a manner which will prevent the recurrence of the dual system, and (5) to permit the transfer of students living in the district to a school outside the district on a non-discriminatory basis. *See December 10, 1969 Court Order* (requiring School Board to comply with the Fifth Circuit's December 9, 1969 Order).

On January 30, 1970, the Court issued a new Decree, implementing the desegregation plan approved by the Office of Education. On appeal, on April 13, 1970, the Fifth Circuit made slight modifications to the plan, including a provision for minority to majority transfers.

In 1971, the Court required that a twelve-member bi-racial committee be implemented to examine the schools in the District. At the recommendation of the committee, the Court slightly modified the desegregation plan.

On August 5, 1998, then-Plaintiffs and the School Board entered into a Settlement and Compromise Agreement ("Compromise Agreement"). The School Board agreed to use all "reasonable means" and "best efforts" to work toward a "target goal" of a racial makeup of 75% white and 25% black for faculty, staff, and administrators, consistent with the racial makeup of the student population of the District. While the parties recognized that it might not be possible to achieve the target goal, they also agreed to specific steps to help in the effort. They created a

Minority Recruitment Oversight Committee, a citizens' advisory committee comprised of five minority residents of the District. The School Board also created two positions of minority recruitment coordinators, which are employment positions filled by minority employees. Finally, the parties agreed that the distribution and assignment of faculty, staff, and administrators would "substantially reflect" the overall racial makeup of the employees of the District.

For many years, this case proceeded with little activity other than an occasional motion for slight modification of the Decree or for approval of a construction project. However, in late 2009 and early 2010, the Court began meeting with representatives of the remaining open desegregation cases in the Monroe Division to determine if any of the districts had achieved unitary status or, if not, what steps the districts needed to take to achieve unitary status.

On January 5, 2010, the Court held a status conference in this case attended by counsel for and representatives of the School Board and Louis Scott, who had been counsel for some of the Plaintiffs. At that time, the Court *sua sponte* ordered the School Board to meet and consider taking action toward achieving unitary status. The Court also instructed counsel for Plaintiffs to determine the status of any remaining Plaintiffs and whether there might be appropriate substitute Plaintiffs.

On March 10, 2010, the Court again met with counsel and representatives. Mr. Scott reported that he had spoken with one of the named Plaintiffs, Bertrand Britton, and one other potential Plaintiff, but neither Mr. Britton nor the other potential Plaintiff retained Mr. Scott to take action in the case.

On November 8, 2010, the Court held another status conference. Elmer Noah, counsel for the School Board, reported that Mr. Scott had taken out an advertisement soliciting potential Plaintiffs, but had not been retained. Mr. Scott did not attend the status conference. A demographer

retained by the School Board, Michael Hefner, was present at the conference and reported that he would be obtaining all information necessary to conduct an appropriate review of the school system under the *Green* factors.

On February 11, 2011, the Court held a status conference. Counsel and representatives for the School Board were present, along with Mr. Hefner. Mr. Hefner stated that he had prepared a draft report on the School Board's compliance with *Singleton* and the Compromise Agreement, using a 20% deviation from student racial demographics to determine if any schools were racially identifiable. He noted his intent to provide a final version of the report at a School Board meeting prior to the next status conference.

On March 11, 2011, the Court held the next status conference, which was again attended by counsel and representatives for the School Board and Mr. Hefner. Mr. Hefner reported that he had completed his unitary status review on faculty and staff assignments. Counsel for the School Board indicated his intent to file a motion for partial unitary status in these areas on the basis of Mr. Hefner's findings.

On October 24, 2011, the Court held another status conference. That conference was attended by counsel and representatives of the School Board, Mr. Hefner, and Willie Hunter, another counsel for some of the Plaintiffs. The School Board reported that it had implemented Mr. Hefner's recommendations on staff and faculty assignment. The School Board had also held two community meetings at the Richwood High School cafeteria. Mr. Hunter was present at the second meeting and reported that he was satisfied with the School Board's efforts and communication thus far. Mr. Hefner stated that he would proceed with his review of the other *Green* factors.

On March 5, 2012, the Court held another status conference. Since the last conference, Mr.

Hefner had completed his report on extracurricular activities, and the School Board had provided a copy to Mr. Hunter and Mr. Scott prior to the status conference. Neither attorney had contacted the School Board or its counsel, and neither attorney was present at the conference.

On June 4, 2012, the Court held another status conference. Since the last conference, Mr. Hefner had completed his report on facilities and stated that he was nearing completion of his report on transportation. Mr. Hunter was present at the conference and articulated concerns about the potential effects of the state educational reform on desegregation. However, he did not express concerns about any of Mr. Hefner's reports.

On July 17, 2012, the School Board filed a Motion for Declaration of Partial Unitary Status as to Faculty Assignments, Staff Assignments, Extra-Curricular Activities, and Physical Facilities [Doc. No. 130]. A status conference was subsequently held on July 20, 2012. At that time, Mr. Hunter stated that he intended to file a pleading with the Court indicating that he is no longer representing any Plaintiffs and that he takes no position on the School Board's motion for a unitary status declaration, but that he has attended meetings in the community and has heard nothing to suggest that the motion is opposed. At the Court's request, however, the School Board agreed to file an amended motion to detail all efforts it has made to notify and involve the community in the unitary status review.

On September 5, 2012, the School Board filed a Motion for Declaration of Unitary Status. After the period for opposition passed, on September 27, 2012, the Court granted the School Board's motion; found that the School Board had achieved unitary status in the areas of faculty and staff assignments, extra-curricular activities, and physical facilities; relinquished supervision of these areas; and dissolved and dismissed the respective portions of the decree.

On July 9, 2013, the School Board filed the instant Motion for Declaration of Unitary Status and for Dismissal. Although notice was provided to Plaintiffs' former counsel and at the most recent personal addresses available, none of the private Plaintiffs have filed an objection to a finding of unitary status. No governmental entity has sought to intervene in this lawsuit, so the motion stands uncontested.

Additionally, prior to filing this motion, the School Board's expert demographer, Mike Hefner, presented his findings and conclusions on the two remaining factors at a public hearing held on April 11, 2013. Notice of this hearing was forwarded to all Ouachita Parish schools, the Town of Richwood, the Town of Sterlington, the City of West Monroe, the Ouachita Citizen, the Monroe News-Star, the Monroe Free Press, the Monroe Dispatch, KNOE, KTVE, and KARD. Notices were published in the four local newspapers. During the April 11, 2013 meeting, no opposition was expressed to the School Board's adoption of Mr. Hefner's conclusions. Following the public hearing, Mr. Hefner presented his recommendations to the School Board in open session.

On May 23, 2013, Mr. Hefner made his final unitary status presentation at a School Board meeting. Copies of Mr. Hefner's final report have been made available to the public at the office of the School Superintendent, Dr. Robert Webber.

## II. LAW AND ANALYSIS

When first presented with a school desegregation case, a district court is charged with determining whether or not a school board has maintained or facilitated a dual school system in violation of the Equal Protection Clause of the United States Constitution. U.S. CONST., Amend. XIV. If the district court finds such a violation, then under *Brown v. Bd. of Educ. of Topeka, Shawnee County, Kan.*, 347 U.S. 483 (1954), and *Brown v. Bd. of Educ.*, 349 U.S. 294 (1955), the

dual system must be dismantled, and the school board must "take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch." *Green*, 391 U.S. at 437-38.

Neither a school board's nor a district court's duty ends with the initial desegregation order. Rather, there is a "continuing duty [for school officials] to eliminate the system-wide effects of earlier discrimination and to create a unitary school system untainted by the past." *Ross v. Houston Indep. Sch. Dist.*, 699 F.2d 218, 225 (5th Cir. 1983) (citing *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 15 (1971)). Likewise, the district court "retain[s] jurisdiction until it is clear that state-imposed segregation has been completely removed." *Id.* (citing *Green*, 391 U.S. at 439; *Raney v. Bd. of Educ.*, 391 U.S. 443, 449 (1968)).

Ultimately, however, the goal of the district court is to return "schools to the control of local authorities at the earliest practicable date." *Freeman v. Pitts*, 503 U.S. 467, 490 (1992). In discharging this duty, the district court considers the Supreme Court's "*Green* factors": (1) faculty and staff assignments; (2) transportation; (3) extra-curricular activities; (4) facilities; and (5) student assignments. *Green*, 391 U.S. at 435; *see also Bd. of Educ. of Okla. City Pub. Sch. v. Dowell*, 498 U.S. 237, 250 (1991). The district court may find that a school board has reached partial unitary status on one or more factors. *Freeman*, 503 U.S. at 489. A school board "bears the burden of showing that any current imbalance [in these areas] is not traceable, in a proximate way, to the prior violation." *Id.* at 493.

"The District Court should address itself to whether the Board had complied in good faith with the desegregation decree since it was entered, and whether the vestiges of past discrimination had been eliminated to the extent practicable." *Dowell*, 498 U.S. at 249-50; *Freeman*, 503 U.S. at

491; *Green*, 391 U.S. at 439; *Ross*, 699 F.2d at 225. To meet its obligation, "[f]or at least three years, the school board must report to the district court." *Monteilh v. St. Landry Parish Sch. Bd.*, 848 F.2d 625, 629 (5th Cir. 1988). Further, "the district in question must have for several years operated as a unitary system." *Lemon v. Bossier Parish Sch. Bd.*, 444 F.2d 1400, 1401 (5th Cir. 1971). If the Court determines that there is no evidence of continued racial discrimination and the school board has acted in good faith to maintain non-discriminatory practices, it may declare the district unitary in one or more subject areas. *See Freeman*, 503 U.S. at 490-91; *see also Price v. Austin Indep. Sch. Dist.*, 945 F.2d 1307, 1314 (5th Cir. 1991) (We use the term "unitary" to refer to a school district that "has done all that it could to remedy the [prior] segregation caused by official action.").

    A.    **The *Green* Factors**

        1.    **Transportation**

No rigid guidelines exist by which to gauge unitary status with regard to transportation. *Swann*, 402 U.S. at 22-31. Certainly, the School Board cannot create or maintain routes based on race. District courts must weigh the soundness of any transportation plan in light of general desegregation concerns. However, those concerns, including the desire to eliminate one-race or majority one-race routes, must be balanced against the need to avoid routes that result in travel times or distances that are "so great as to either risk the health of the children or significantly impinge on the educational process." *Id.* at 30-31.

In this case, the evidence demonstrates that the School Board has a non-discriminatory transportation plan which provides the opportunity for bus transportation to and from school to all eligible students enrolled in the District by routes that are devised based on geographical and economical concerns, not the race of the students. Though there are some majority one-race routes,

those routes exist as a result of residential housing patterns in the neighborhoods, subdivisions, or housing developments served by the schools.

Based on these facts, the Court finds that the School Board has operated and continues to operate its system-wide transportation program in a unitary manner, with no vestige of past discrimination remaining in that area of operation. It has adhered to its non-discriminatory policies and practices for many more than the requisite three years necessary to demonstrate it has attained unitary status in that area of operation. Therefore, the District is declared unitary in the area of transportation.

### 2. Student Assignment

The last remaining *Green* factor is that of student assignment. Student assignment is relevant to determining whether a school district has remedied, to the extent possible, the vestiges of prior *de jure* segregation. Dowell, 498 U.S. at 250. The law does not require that all schools in a district be racially balanced as a prerequisite to a unitary status finding. *See Anderson v. Sch. Bd. of Madison Cnty.*, 517 F.3d 292, 298 (5th Cir. 2008). As the Fifth Circuit has explained,

> [t]he constitution does not require school districts to achieve maximum desegregation; that the plan does not result in the most desegregation possible does not mean that the plan is flawed constitutionally. The constitutional command to desegregate schools does not mean that every school in every community must always reflect the racial composition of the school system as a whole. The school board's constitutional duty is to cure the continuing effects of the dual system, not to achieve an ideal racial balance.

*Monteilh v. St. Landry Parish Sch. Bd.*, 848 F.2d 625, 632 (5th Cir. 1988) (internal quotations and citations omitted). The Court need not employ "'awkward,' 'inconvenient,' or 'even bizarre' measures . . . to achieve racially balanced school assignments 'in the late phases of carrying out a decree, when the imbalance is attributable neither to the prior *de jure* system nor to a later violation

by the school district but rather to independent demographic forces.'" *Hull v. Quitman Cnty. Bd. Of Educ.*, 1 F.3d 1450, 1454 (5th Cir. 1993) (quoting *Freeman*, 503 U.S. at 493). A school board's affirmative duty does not compel it to adopt the most desegregative student assignment alternative available, but to act in good faith within the practical limitations. *Swann*, 402 U.S. at 18 (citation omitted).

Several principles can guide the Court to determine whether current racial imbalance is a product of prior discrimination. Schools that were previously *de jure* segregated white but now enroll a predominantly black student body cannot be considered to be a vestige of prior *de jure* segregation. *Freeman*, 503 U.S. at 478, 495. Furthermore, schools previously brought into racial balance by remedial efforts but which have since fallen out of balance as a result of private choices (including changes in demographics) similarly cannot constitute a vestige of prior *de jure* segregation. *Id.*; *N.A.A.C.P., Jacksonville Branch v. Duval Cty. Sch.* 273 F.3d 960, 969-73 (11th Cir. 2001); *Belk*, 269 F.3d at 395-96.

In this case, the School Board operates five high schools: Sterlington, Ouachita, Richwood, West Monroe, and West Ouachita; eight middle/junior high schools: Sterlington, Ouachita, Richwood, West Ridge, Good Hope, Riser, Calhoun, and Woodlawn; one pre-K-8th grade: Pinecrest; one pre-K/kindergarten center: Crosley; nineteen elementary schools: Sterlington, Jack Hayes, Lakeshore, Swartz, Robinson, Shady Grove, Swayze, Claiborne, Drew, Highland, Boley, George Welch, Kiroli, Lenwil, Riser, Riverbend, Calhoun, Central, Woodlawn; and a parish-wide alternative education program: the Ouachita Parish Alternative Center. Students are assigned to schools based on their grade levels and physical residence or in accordance with approved transfers, other than with regard to the Alternative Center. Total District-wide student enrollment for 2012-13

was 19,930 students. The student racial demographics are 64.6% white, 32.8% black, and 2.6% other races.

Four of the elementary schools–Highland, Lakeshore, Riser, and Sterlington–fall within the +/- 20% deviation that has been used by the Court in the past to evaluate desegregative efforts. Kiroli Elementary is only slightly outside the 20% range. The remaining elementary schools are racially identifiable. However, the racial identifiability is a reflection of the neighborhoods from which the student populations are drawn.[3] There is no evidence to suggest that the racial composition of the schools is a result or vestige of *de jure* discrimination.

Even though the elementary schools are not all racially diverse, the elementary schools feed into middle/junior high schools and high schools which are more diverse. Both Good Hope and Riser Middle Schools are within the 20% deviation, and Ouachita Junior High and Sterlington Middle Schools are only slightly outside this range. Richwood, West Ridge, Pinecrest, Calhoun, and Woodlawn are racially identifiable, but as is the case with the elementary schools, the student populations of the middle/junior high schools reflect the racial demographics of the attendance zones.

The high schools are more racially diverse because of the larger area from which they draw students. With the exception of Richwood and West Ouachita, the high schools are more diverse

---

[3]Mr. Hefner observed in his report that there is a "hole" in the attendance zone where the Industrial Park is located in West Monroe. Originally, this was not anticipated to be a residential area, now several students live in its perimeter. Those students have been attending Claiborne Elementary, West Ridge Middle School, and West Monroe High School. Although the School Board did not seek approval from the Court for this action, the Court finds the School Board's assignment to be reasonable given the location. Since the Court is granting the School Board's motion, the District will no longer be under the Court's supervision, and the School Board may assign this feeder zone to the schools it deems appropriate.

than many of the schools feeding into them.

Finally, the Ouachita Alternative Education Center is a special school designed to address the educational needs of students who have suffered some type of disciplinary action from other schools in the District. Therefore, assignment to this school is not based on race, but disciplinary record.

After considering the School Board's filings and the record in this matter, the Court finds that there is no evidence to suggest that the current racial composition of the schools in the District is a vestige of the prior *de jure* discriminatory system. Likewise, there is no evidence to suggest that the racial composition of the schools is the result of any recent discriminatory action by the School Board. Although both Richwood and West Ouachita are clearly racially identifiable, both schools are geographically remote and reflect the housing choices of citizens in those areas. Indeed, this Court recognized the geographic remoteness of Richwood and the fact that the schools in that area would be racially identifiable in the 1998 Consent Decree.

Because many of the schools remain either racially identifiable or outside the standard deviation, the Court has considered whether the School Board has taken all steps practicable to eliminate the vestiges of discrimination. Absent very aggressive steps, such as cross-Parish bussing, there is no evidence to suggest that a greater racial balance could be achieved. Bussing of this type would result in lengthy rides for students of all races, is not in the best interest of the welfare of the students, and is unlikely to achieve the goal of further desegregation. Based on this Court's recent experiences with the active desegregation cases in the surrounding parishes and cities, cross-Parish bussing is more likely to result in the creation of additional charter schools and would only further complicate desegregation efforts.

While the racial balance of the schools in the District is not perfect, students in almost all feeder systems, except Richwood and West Ouachita, will have the opportunity to attend at least one school (elementary, middle or high) that is more racially diverse.

Under these circumstances, the Court finds that the School Board has effectively eradicated any vestige of past discrimination in the area of student assignment and has maintained such nondiscriminatory policies and practices for many more than the requisite three years necessary to demonstrate it has attained unitary status in that area of operation. Therefore, the District is declared unitary in the area of student assignment.

### B. Good Faith

The Court's findings with regard to the *Green* factors of transportation and student assignment constitute outward signs of the School Board's commitment to its students, employees, the public, and this Court that it has, in good faith, erased all vestiges of prior discrimination in these areas. Having fully reviewed the submissions of the School Board, the Court also finds that it has demonstrated its good faith commitment to the goals of desegregation, so that students, parents, and the public have assurance that the School Board will not engage in further discrimination.

### III. CONCLUSION

For the foregoing reasons, the School Board's motion is GRANTED. The Court finds that the School Board has demonstrated that it has achieved unitary status in the remaining areas of transportation and student assignment; has exhibited good faith in achievement and maintenance of such non-discriminatory programs; and is prepared, willing, and ready to move forward in a constitutionally consistent manner without direct judicial supervision in these areas. The Court relinquishes its supervision of these areas and returns supervision to the School Board. All

remaining portions of the Decree and/or orders of this Court are DISSOLVED, and this case is DISMISSED WITH PREJUDICE.

MONROE, LOUISIANA, this 13th day of August, 2013.

_____
ROBERT G. JAMES
UNITED STATES DISTRICT JUDGE